**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**

_____

| | |
|---|---|
| SHELLEYANN BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| - v - | )  Civil No. 2005-109 |
| | ) |
| JANET NAPOLITANO, et al., | ) |
| | ) |
| Defendants. | ) |

_____ )

## FEDERAL DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COME NOW the Federal Defendants, by and through counsel Paul A. Murphy, Acting United States Attorney for the District of the Virgin Islands, and Jason T. Cohen, Assistant United States Attorney, and submits the following brief in support of their Motion for Summary Judgment.

## I.        STATEMENT OF THE CLAIMS

Plaintiff ShelleyAnn Brown alleges wrongful termination on the bases of race, sex, color, and disability under Title VII of the Civil Rights Act ("TitleVII") (Count I).  Plaintiff also alleges assault and battery (Count II), negligent supervision, negligent retention, and unsafe workplace (Count III), negligent infliction of emotional distress (Count IV), and intentional infliction of emotional distress (Count V) caused by the alleged acts and omissions of the United States.  Lastly, Plaintiff brings a *Bivens* claim (Count VI), alleging that six unknown and unnamed agents of the federal government conspired to destroy evidence and intentionally violated Plaintiff's constitutional rights by denying her access to the courts.[1]

---

[1]  The federal defendants moved to dismiss counts II through VI, and the disability portion of count I, on June 25,

1

Plaintiff, a Black female resident of the U.S. Virgin Islands, alleges in Count I that in terminating her employment as a security screener, the Transportation Security Administration ("TSA"), through Michael Chertoff as Secretary, U.S. Department of Homeland Security, willfully, knowingly, and intentionally discriminated against her on the basis of race, sex, color, and disability.    In response, the Federal Defendants have articulated legitimate, nondiscriminatory reasons for terminating Plaintiff's employment, which Plaintiff cannot show to be pretext.  As Edward Bacco, Assistant Federal Security Director for Screening, stated in a December 22, 2003, dismissal letter:  "Your termination is based on your lack of availability for duty. . . . Your continued unavailability poses a problem to our operations . . . [and] your absence places a burden on our ability to fulfill our screening responsibilities."  FD Exh. 15.[2]  Moreover, as set forth below, there is no genuine issue of material fact precluding summary judgment in favor of the Federal Defendants with respect to Counts II through VI, and the Federal Defendants are entitled to judgment as a matter of law.

## II.    APPLICABLE LEGAL STANDARD

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  As the Supreme Court explained in *Celotex v. Catrett*, 477 U.S. 317, 327 (1986) (internal citations omitted): "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to

---

2007.  Oral argument on the motion was held on November 29, 2007.  As of this date, the Court has not ruled on the motion to dismiss.  The filing of this summary judgment is in accordance with the Court's filing deadline, and is not intended to supplant or supersede the pending motion to dismiss in any way.

[2]  The Federal Defendants' Exhibits, hereinafter referred to as "FD Exh. __", are attached to the Federal Defendants' Statement of Material Facts About Which There Is No Genuine Issue.

secure the just, speedy and inexpensive determination of every action." In making a summary judgment determination, the court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). This standard is applied with added rigor in employment discrimination cases, where intent and credibility are critical issues. *Stewart v. Rutgers*, 120 F.3d 426, 431 (3d Cir. 1997).

Rule 56(c) mandates summary judgment if a party fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322 (1986). In such a situation, there is no genuine issue of material fact since there is a failure of proof concerning an essential element of the non-moving party's case that renders all other facts immaterial. *Celotex*, 477 U.S. at 322-23. The moving party meets its burden if it illustrates that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325. The party opposing a motion for summary judgment may not rely on mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    ARGUMENT

### A.    Defendants Reassert All Defenses Raised in Their Partial Motion to Dismiss.

Defendants reassert, and do not waive, all of the defenses set forth in their previously filed Partial Motion to Dismiss. These defenses include, *inter alia*:

> 1) Plaintiff's disability claim is not within the scope of Title VII and, furthermore, the Aviation and Transportation Security Act preempts any Rehabilitation Act claims she might make;

2)  Plaintiff's tort claims are barred by the intentional tort exception of the Federal Tort Claims Act; and,

3)  Plaintiff's *Bivens* claim is barred by the Civil Service Reform Act and fails for failure to state a claim upon which relief can be granted.

**B.    Plaintiff Cannot Meet Her Burden of Proof as to Wrongful Termination in Violation of Title VII.**

### 1.    Burden Shifting Framework for Analyzing Title VII Claim.

Where the plaintiff sets forth Title VII wrongful termination claims that rely on circumstantial evidence to prove discrimination, as in this case, the claims are analyzed under the three-pronged burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny.  First, the plaintiff bears the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  That is, a plaintiff must demonstrate 1) that she is a member of a protected class; 2) that she was qualified for the position in question; 3) that she was discharged; and 4) that she was terminated "under circumstances that give rise to an inference of unlawful discrimination." *Waldron v. SL Indus. Inc.,* 56 F.3d 491, 494 (3d Cir.2005) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)).

If the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action.  *McDonnell Douglas Corp.,* 411 U.S. at 802.  Under this second prong, the employer has the burden of producing rebuttal evidence. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506-07 (1993); *see also Burdine,* 450 U.S. at 255, 255 n. 9 (noting that such evidence must be admissible).  The employer can satisfy this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for

the unfavorable employment decision." *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994) (citing *Hicks,* 509 U.S. at 507). This second prong does not require the employer to prove "that it was actually motivated by the proffered reasons. It is sufficient if the [employer's] evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 254. Even though the burden of production shifts to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 253.

Finally, once the defendant has offered a legitimate, nondiscriminatory reason for its actions, the burden of production under the third and final prong shifts back to the plaintiff to show, by a preponderance of the evidence, that the proffered reason is pretextual. *See id.* at 256. To satisfy this burden, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes,* 32 F.3d at 764 (citing *Hicks,* 509 U.S. at 511).

The essential factual inquiry in a case of employment discrimination is "whether the defendant intentionally discriminated against the plaintiff." *United States Postal Serv. Bd. Of Governors v. Aikens*, 470 U.S. 711, 715 (1983); Burdine, 450 U.S. 248, 253 (1981). That is, Plaintiff must prove by a preponderance of the evidence that her termination was actually motivated by intentional discrimination against her as a member of a protected class.

> **2.** **Plaintiff Has Failed to Set Forth Sufficient Evidence to Establish a *Prima Facie* Case that she was Wrongfully Terminated on the Basis of her Race, Color, or Sex.**

Federal Defendants concede that Plaintiff is a member of classes protected by Title VII based on her race (African American), color (black), and sex (female).[3]  Federal Defendants concede that at the time of her employment Plaintiff was qualified for her position and that her termination was an adverse employment action.  Plaintiff, however, cannot establish a *prima facie* case of race, color or sex discrimination because the circumstances under which she was terminated do not give rise to an inference of discrimination.

Rather than giving rise to an inference of discriminatory motive, the record is replete with evidence that TSA management hoped to avoid terminating the Plaintiff and wanted her to continue to work at TSA.  They repeatedly asked her to return to work.  *See* FD Exh. 15; 16, at p. 4; 24; 26; 28; 37, at p. 2.  Even after Plaintiff had failed to return to work for over 3 months, and TSA was forced to consider her termination because of the operational burdens her absence created, TSA management once again asked her to return to work.  *See* Nov. 5, 2003, Letter, attached as FD Exh. 28.

Plaintiff offers nothing but rank speculation to support her accusations of a racially discriminatory motive behind her termination.  Plaintiff herself disclaims any belief that the man who decided to terminate her, Assistant Federal Security Director (AFSD) Edward Bacco, was himself racist, stating in her deposition that, "I didn't have any reason to think that he was racist."   FD Exh. 7 (Brown Depo at 128).   In her deposition, Plaintiff expresses her disappointment at receiving an apology regarding the July 27th incident involving Allen Burdette from AFSD Bacco instead of FSD Duffy and concludes, "And you care about me?  He didn't care about me.  So that makes me feel like—and they all are White.  They all are White and I'm

---

[3]  Defendants do not concede that Plaintiff's alleged disability falls within the protections of Title VII.  *See* Defendants' Partial Motion to Dismiss.

Black, so what would, what would I think?  That's what I thought."  *Id*. at 129.  In effect, Plaintiff points to an expression of concern for her welfare (from the very man who ultimately decided to terminate her) as evidence that "they" (*i.e.*, White people) did not care about her. This does not support an inference of a racially discriminatory motive underlying her termination for never coming to work for several months.

Nor does Plaintiff offer any evidence that sexism motivated her termination.  When asked during her deposition if she thought AFSD Bacco was sexist she answered:  "I have no reason to believe that he was [sexist] but under the circumstances, again, I have no reason to judge anyone. These people, I don't know them personally on a personal level."  FD Exh. 7 (Brown Depo at 129).  Plaintiff goes on to say that because of the way management handled the alleged assault "it tells me he is sexist.  That he—or that he behaved like a sexist."  *Id*.  But Plaintiff immediately goes on to say, "I don't want to say he's sexist or he behaved like one."  *Id*. Plaintiff goes on to explain, "If they were so concerned sincerely, they would do something about it, to make an example of others."  *Id*. at 130.  Plaintiff is again referring to the handling of the alleged July 27th assault and not referring to her termination.  She says she wanted management to "make an example of others."  *Id.*  Presumably the "others" she refers to is Allen Burdette.  But TSA management immediately placed Burdette on leave and then terminated him. FD Exhs. 34, 35, & 36.  It is not clear what other example Plaintiff could have desired. Nevertheless, none of these complaints relating to the July 27th incident involving Burdette themselves relate to her termination, which is the relevant adverse employment decision for purposes of this complaint.  Even if they did relate to an adverse employment decision within the

ambit of Title VII, they are pure speculative assignments of discriminatory motive lacking any evidentiary support.[4]

Plaintiff is also unable to establish an inference of discrimination by demonstrating that similarly situated non-protected persons were treated more favorably than her. *Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir. 1990); *Hankins v. Temple Univ.,* 829 F.2d 437, 440 (3d Cir. 1987). "[T]o be deemed 'similarly situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992); *see also Perkins v. Brigham & Women's Hosp.,* 78 F.3d 747, 751 (1st Cir.1996) (proposed comparable employees must be similarly situated in all "material respects"); *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 803 (6th Cir.1994) (stating that "[i]n order for two or more employees to be considered similarly-situated . . . the plaintiff must prove that all of the relevant aspects of his employment situation are nearly identical to those of the employees who he alleges were treated more favorably"); *Lanear v. Safeway Grocery,* 843 F.2d 298 (8th Cir.1988) (plaintiff must prove that he and the white employee were similarly situated in all respects and that the other employee's acts were of comparable seriousness to his own); *Dill v. Runyon,* 1997 WL 164275 (E.D. Pa. Apr. 3, 1997).

---

[4]  During her deposition Plaintiff often seemed to be complaining about whether or not Allen Burdette should have been sent to jail because of the unfortunate incident that occurred between them on July 27, 2003.  In explaining why she believed she was discriminated against on the basis of race, Plaintiff stated that, "I honestly believe that if I – if he was a Black male and I was a White woman, and that Black male assaulted a White woman at the checkpoint, a manager at that, I think he would be in jail."  FD Exh. 7 (Brown Depo at 43).  The incarceration of Burdette or the lack thereof is not a TSA adverse employment decision within the scope of Title VII.

Plaintiff points to Allen Burdette (white male) as being treated more favorably than her. "He was treated more favorably than me. He was able to have his job being paid and he assaulted me, and was found guilty when we went to court the following day." FD Exh. 7 (Brown Depo at 56). Plaintiff is incorrect; Burdette was not similarly situated to the Plaintiff. They did not share the same job position nor did they report to the same supervisor. Plaintiff, a Security Screener, reported to several Security Supervisors. *See* FD Exh. 9. Burdette, a Security Manager, reported to the Federal Security Director and Assistant Federal Security Director for Screening. *Id*. Plaintiff and Burdette did not share the same duties. Burdette, as a Security Manager, was responsible for managerial duties at the security checkpoint, overseeing Security Supervisors and Security Screeners. FD Exh. 6; 34; 35. Plaintiff, a Security Screener, was responsible for the performance of security screening duties. FD Exh. 40; *see also* FD Exh. 7 (Brown Depo at 38). Burdette did not engage in the same behavior for which Plaintiff was terminated (*i.e.*, unavailability for duty). Finally, when Plaintiff points to the favorable treatment Burdette allegedly received (*i.e.*, that he was not terminated), she is simply wrong. Burdette was terminated (the exact same adverse employment action Plaintiff received) for inappropriate conduct (different from that engaged in by the Plaintiff). *See* FD Exhs. 34 & 35. Accordingly, Burdette is in no sense a proper comparator because he was not similarly situated to the Plaintiff.

Plaintiff also alleges that Charles Payne (white male) was similarly situated to her because he, a fellow Security Screener, reported to work early and left early every day, while, on one occasion, she was not permitted to leave her shift early. "He always leaves at the same time every day, and that was the only day that I came in earlier than I usually do and was going to leave with him, and was told that I could not leave but he was able to leave." FD Exh. 7 (Brown Depo at 44). Plaintiff admits that on the day in question she did not obtain permission to leave

9

early. *Id*. at 47. Moreover, Plaintiff does not allege that Payne engaged in the behavior for which she was terminated, a prolonged period of unavailability for work, because the record is void of any such evidence. Thus, Payne is not a proper comparator.

Plaintiff cannot point to similarly situated non-protected persons who were treated more favorably than her. Because Plaintiff cannot demonstrate circumstances that give rise to an inference of unlawful discrimination, she fails the fourth prong of the *prima facie* case. Accordingly, she cannot make out a *prima facie* case of discrimination and judgment should be entered for the Defendants.

> **3.    Even Assuming, *Arguendo*, That Plaintiff Can Establish a *Prima Facie* Case, Plaintiff Cannot Establish That Defendant's Non-Discriminatory Reason for Her Termination is Pre-text.**

Assuming that Plaintiff can meet the burden of establishing a *prima facie* case of wrongful termination under Title VII, then the burden of production shifts to the Federal Defendants to articulate some legitimate, nondiscriminatory reason for the termination. *McDonnell Douglas Corp.*, 411 U.S. at 802. In this case, the evidence firmly establishes that the Federal Defendants terminated Plaintiff's employment with TSA because Plaintiff's prolonged unavailability for duty placed a burden on TSA's ability to fulfill its screening obligations in the U.S. Virgin Islands.

On December 22, 2003, Edward Bacco, Assistant Federal Security Director for Screening, notified the Plaintiff by letter that he had decided to terminate her employment with TSA. FD Exh. 15. This decision was based upon the Plaintiff's lack of availability for duty. It was in no way based upon considerations of race, color or sex. *See* Bacco Declaration, FD Exh. 30. The letter explained that Plaintiff had been on leave without pay status since August 24, 2003, and that, via letter dated October 27, 2003, Plaintiff's own physician had certified that she

was unable to return to work for an indefinite period of time.  On November 5, 2003, TSA sent Plaintiff a letter advising her that she would be permitted to stay on leave without pay status for another two weeks but that if she was unable to return to work by November 19, 2003, she would be subject to termination.  AFSD Bacco noted that TSA management had assured Plaintiff that she "would not have any contact with the individual who was involved in the incident with [her] on July 27, 2003."  FD Exh. 15.  He further explained that Plaintiff had not responded to TSA's letter of November 5, 2003, and that she had not attempted to contact TSA management or report to work.  The letter explained, "Your continued unavailability poses a problem to our operations. As you may know, the Cyril E. King Airport is understaffed and we cannot operate efficiently with unfilled positions, especially now during one of our busiest seasons.  Thus, your absence places a burden on our ability to fulfill our screening responsibilities."  *Id*.  The very real operational problem posed by Plaintiff's unavailability for work was TSA's legitimate non-discriminatory reason for her termination.

Plaintiff cannot show that TSA's legitimate non-discriminatory reasons for terminating Brown should be doubted, nor can she raised any material issues of fact regarding her claim.  *See Burdine*, 450 U.S. at 256.  In order to satisfy this burden, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes,* 32 F.3d at 764 (citing *Hicks,* 509 U.S. at 511).

Here, Plaintiff was disciplined for failing to come to work over a prolonged period of time.  *See* FD Exh. 15.  There is no dispute as to her unavailability for duty from July 29, 2003,

through December 22, 2003.  Yet, rather than being eager to terminate the Plaintiff, the record shows that TSA management repeatedly gave Plaintiff an opportunity to return to work or to provide enough medical information so that it could ascertain what duties (even if they were limited) she could perform on the job.  *See* Letters dated August 7, 2003, October 10, 2003, November 5, 2003, and December 22, 2003 (FD Exhs. 24, 26, 28, & 15).    As TSA Administrative Officer Estevez explained, the August 6th and August 18th, 2003, letters that the Plaintiff submitted from Dr. Lu were insufficient and nonresponsive.  "That's why we kept on going back and said, 'Can you please look at what can't she do out of all this?'  Or 'Can you give us a timeframe when she should be back to work?'" FD Exh. 8 (Estevez Depo at 101).  It was only when it became clear that the Plaintiff would not return to work, and that the period of her absence would be indefinite, that management became concerned.  AO Estevez explained, "My concern then was Dr. Lu's letter kept on saying 'indefinite.' . . . It kept on saying who knows where out in the future.  We were shorthanded.  She was holding a spot, as far as an employee, that we could use on the line.  We were under fire to do our mission, okay, which is screen passengers . . . [a]nd we needed to know if she could come back to work either part-time or whichever way."  FD Exh. 8 (Estevez Depo at 53-54).

Although Plaintiff last reported to work on July 27th, it was not until December 22nd that TSA finally issued a termination letter.  It is clear that TSA tried to avoid terminating her for many months.  It was only after Plaintiff's doctor indicated that she would be unavailable for work "indefinitely" (*see* October 27, 2003, Letter, at FD Exh. 27) and after Plaintiff had completely ignored TSA's November 5, 2003, request that she return to work by November 19th that TSA decided it had to move forward with her termination in the operational interests of the Agency.  According to AO Estevez, Plaintiff's absence adversely effected business activity and

employee morale. "Business activity, we needed the body to do the work . . . accomplish the mission. Employee morale, because some other employees, you know, felt they had to carry the weight of somebody that was not there when they were doing their best to be there. Some other employees had other illnesses and stuff but still came to work, you know." FD Exh. 8 (Estevez Depo at 86); *see also* Bacco Declaration, FD Exh. 30.

Plaintiff failed to contact TSA to discuss her situation after the November 5, 2003, letter informing her that she might be terminated in two weeks, despite assurances by TSA that she would not have any contact with the screening manager that was involved in the incident with her on July 27, 2003, and that management would support her in any way possible. FD Exh. 7 (Brown Depo at 41-42 & 103); FD Exh. 28. While at first this appears curious, her lack of responsiveness makes sense because Plaintiff never intended to return to work. When asked at her deposition if she ever intended to return to work at TSA, Plaintiff explained, "You know, I – no, not at TSA, not where Allen Burdette worked because at the time that's where I thought that he was still at work. He was still working. And no, I did not. And no, I did not want to work with the managers and the leads that all conspired in the whole thing as far as I'm seeing it. I did not want to return." FD Exh. 7 (Brown Depo at 134). When asked if she intended to return to work once she was informed in writing that she would have no contact with Burdette, Plaintiff replied, "No, I didn't believe them. I believed that once he is on the team I was going to see him." *Id.* at 135. It is clear from Plaintiff's own testimony that there is nothing TSA could have done to bring her back to work. Despite the fact that TSA management repeatedly expressed to the Plaintiff its sincere desire to have her return to work, Plaintiff would not return. Under such circumstances, TSA had no alternative but to separate her from federal service.

Thus, the Federal Defendants have produced legitimate, nondiscriminatory business reasons for Plaintiff's termination that are well-documented in the record. Namely, that Plaintiff's extended, 'indefinite' absence created operational problems for TSA and interfered with the agency's ability to fulfill its screening responsibilities at the Cyril E. King Airport in St. Thomas. The Court should grant summary judgment on Count I because Plaintiff has failed to cast any doubt on TSA's legitimate non-discriminatory reasons for terminating Plaintiff and failed to raise material issues of fact regarding her claim.

**C.    Plaintiff Cannot Meet Her Burden of Proof With Regard to Her Tort Claims[5]**

**1.    Plaintiff Cannot Establish Foreseeability For Her Negligence Claims.**

Plaintiff's claims of negligence (negligent supervision, negligent retention, unsafe workplace, negligent infliction of emotional distress) all fail because she is unable to establish the essential element of foreseeability for all such claims.

Pursuant to 1 V.I.C. § 1/4, the tort law of the Virgin Islands is to be found in the Common Law as expressed in the Restatement of Torts.

In general, in order to prevail in a cause of action for negligence, a plaintiff must meet her burden of establishing four elements: duty, breach, legal causation, and loss. Restatement (Second) of Torts § 281. An employer has a duty to an employee to protect him or her against unreasonable risk of physical harm. Restatement (Second) of Torts § 314A. For an employer to breach its duty, harm must be more than merely possible; it must be foreseeable. *See Miller v. Consolidated Rail Corp.*, 1999 WL 179799 at *6-7 (E.D. Pa. 1999) (unpublished). In other

---

[5] All of Plaintiff's tort claims are jurisdictionally barred. *See* Federal Defendant's Partial Motion to Dismiss.

words, the employer must have knowledge of the dangerous or harmful conditions, and an opportunity to remedy them. *Id.*

Courts generally look to the Restatement (Second) of Agency § 213 (1957) when considering such claims as negligent hiring and negligent retention. In order to prevail the Plaintiff must show: (1) the employer knew, or in the exercise of ordinary care should have known, of its employee's unfitness at the time of hiring; (2) that through the negligent hiring of the employee, the employee's incompetence, unfitness, or dangerous characteristics proximately caused the resulting injuries; and (3) that there is some employment or agency relationship between the tortfeasor and the Defendant employer.

In order to maintain a claim for negligent supervision, the Plaintiff must show that "the harm was caused by the principal's negligence in selection, training, retaining, supervising, or otherwise controlling the agent." Restatement (Third) of Agency § 7.05. Comment d of this section stresses that conduct is not negligent or reckless unless there is a foreseeable likelihood that harm will result from the conduct.

To succeed on a claim for negligent infliction of emotional distress, a plaintiff must prove physical harm and foreseeability. *Reed v. National Radio Astronomy Observatory*, 2008 WL 4951505 (D.V.I. Nov. 17, 2008) (slip copy). The relevant inquiry for the foreseeability element of a negligent infliction of emotional distress claim is whether the person who caused the distress "should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and . . . from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily

15

harm."  Restatement (Second) of Torts § 313; *see also Anderson v. Gov't of the Virgin Islands*, 180 F.R.D. 284, 287 (D.V.I. 1998).

Accordingly, all of these torts (negligent retention, negligent supervision, unsafe workplace, negligent infliction of emotional distress) require that it be reasonably foreseeable that the alleged offending conduct could cause, and did cause, the alleged harm.

Plaintiff cannot show that TSA knew, or in the exercise of ordinary care should have known, that Allen Burdette was incompetent, unfit or dangerous in any way.  Burdette was hired in September 2002, and like all TSA employees hired after February 2002, he was required to undergo and pass a criminal history records check and a credit check.  FD Exh. 36; Greenlee Declaration, FD Exh. 10.  Moreover, prior to July 27, 2003, TSA had never received any complaints about Burdette's conduct as a supervisor or his treatment of other employees.  FD Exh. 8 (Estevez Depo at 103).  In fact, Plaintiff herself indicates that, to her knowledge, Burdette never had so much as shouted before.  *See* FD Exh. 7 (Brown Depos at 123).  Nor had he previously touched her in a way of which she disapproved.  *See id*. at 123.  In fact, Plaintiff had a good working relationship with Burdette.  *Id*.  In sum, TSA simply could not have foreseen that Burdette would engage in the onetime conduct of which Plaintiff complains.  Because Plaintiff cannot show that TSA knew or should have known that Burdette was allegedly incompetent, unfit or dangerous, judgment on these claims should be entered for the Defendant.

### 2.    Plaintiff Cannot Meet Her Burden of Proof for Intentional Infliction of Emotional Distress.

Plaintiff's allegation of intentional infliction of emotional distress must be dismissed because she cannot show, as a matter of law, that the Federal Defendants intended to cause or

recklessly did anything to cause her alleged distress and because she cannot show that their conduct was at all extreme or outrageous.

Section 46 of the Restatement (Second) of Torts, pertaining to "outrageous conduct causing severe emotional distress," provides:

> (1)    One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

As noted by the Third Circuit, "[t]he gravamen of the tort of intentional infliction of emotional distress is that the conduct complained of must be of an extreme or outrageous type." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988) (citation and internal quotations omitted). Whether the defendant's conduct is so extreme or outrageous as to permit recovery is initially a matter to be decided by the court. Restatement (Second) of Torts § 46 comment h. Under Virgin Islands law, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Ramos v. St. Croix Alumina, L.L.C.*, 277 F. Supp. 2d 600, 604 (D.V.I. 2003) (overruled on other grounds by *Miller v. Virgin Islands Hous. Auth.*, 2005 WL 1353395, at *5 n.4 (D.V.I. June 3, 2005)) (citation omitted). Allegations of discrimination alone are insufficient to support such a claim. *Id.* Moreover, for an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress, or must know that such distress is substantially certain to result from his conduct, or must act recklessly in deliberate disregard of a high degree of probability that emotional distress will follow. Restatement (Second) of Torts § 46 comment i.

17

The record in this case is devoid of any evidence that TSA intended to do, or recklessly did, anything that would produce a high level of emotional distress in the Plaintiff. The only intention clear on the face of the record is that the TSA valued the Plaintiff's contributions and hoped to bring her back into the workplace. While Burdette acted inappropriately on July 27th, the evidence shows that this was an isolated incident, and that TSA responded thoroughly and appropriately.

Nor can the Federal Defendants' conduct be described as extreme and outrageous. Such conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Restatement (Second) of Torts § 46 comment d. TSA's conduct throughout the entire relevant time period demonstrates an effort to get the Plaintiff back to work and on the payrolls, and to provide her with any necessary support and accommodations to do so. Thus, in an effort to investigate the July 27th incident, and to create a comfortable environment for the Plaintiff, Defendants immediately placed Allen Burdette on leave and asked the Plaintiff to return to work, with assurances that she would not have any further contact with Burdette.

### D.  Plaintiff Cannot Meet Her Burden of Proof With Regard to Her *Bivens* Claim.[6]

"A *Bivens* claim is an implied right of action allowing plaintiffs to sue federal agents acting under color of federal authority for civil rights violations." *Bartholomew v. Federal*

---

[6]  For the reasons set forth in the Partial Motion to Dismiss, Count VI must be dismissed for failure to state a claim upon which relief can be granted and lack of subject matter jurisdiction. Moreover, if Count VI were to survive the motion to dismiss and motion for summary judgment, the government reserves the right to assert qualified immunity for any named individuals who are identified and properly served as defendants.

*Bureau of Prisons*, 2008 WL 4400170, at *5 (M.D. Pa. Sept. 23, 2008) (slip copy).  In order to bring a *Bivens* claim, 1) the defendants must have been acting under the color of federal law, and 2) the defendants must have caused the plaintiff to be deprived of a right secured by the Constitution and laws of the United States.  *Abrahams v. United States Marshals Serv.*, 2007 WL 3025073, at *2 (D.V.I. Aug. 14, 2007) (unpublished).  Moreover, "*Bivens* involves not negligent acts, but intentional constitutional violations that must be deterred and punished."  *United States v. Stanley*, 483 U.S. 669 (1987); *see also Polanco v. United States Drug Enforcement Admin.*, 158 F.3d 647, 653 (2d Cir. 1998) (*Bivens* causes of action are "intended to prevent intentional violations of the Constitution").

Plaintiff claims that, in order to frustrate her constitutional right to access the courts, several unknown federal agents destroyed a videotape containing footage of the incident between herself and Allen Burdette on July 27, 2003.  But the record does not even support the existence of a videotape containing footage of such an incident.  Shortly after July 27th, TSA AO Emilio Estevez viewed a videotape containing footage of an area adjacent to where the incident allegedly occurred. FD Exh. 8 (Estevez Depo at 21 & 94).  This videotape, however, did not contain footage of the alleged assault.  AO Estevez explained:  "And we looked through various tapes about that timeframe.  Finally, there was a part where you could see Ms. Brown and Mr. Burdette speaking.  You couldn't hear it of course. . . . I couldn't tell you what they were saying.  It didn't seem like either of them were aggravated.  They were just having a conversation . . . Then she turned, walked away.  He followed.  And that's all you could see, because they went off the screening [sic].  It's my understanding from other people, and I think Shellyann's

Statement, that after that they faced each other later on again, that's where all the other stuff happened." *Id.* at 26-27.  Thus, no videotape containing footage of the alleged assault existed.[7]

Nor did TSA even own or possess the videotape in question.  TSA did not have videotapes of its own at the time and the videotape TSA AO Estevez viewed was owned by a separate agency, U.S. Customs and Border Protection ("CBP").  *Id.* at 94.  Soon after viewing the tape, Estevez tried to get a copy of it from CBP, but the tape had already been automatically deleted pursuant to that Agency's normal procedures.  *Id.* at 31.  At the time that this incident happened, TSA had never previously had occasion to ask CBP for a tape of any type of incident, there was no protocol in place for preserving such tapes, and TSA officials were not aware of how long CBP kept the tapes.  *Id.* at 94-95.  In essence, erasure of the tape was inadvertent.  Beyond her mere allegations, Plaintiff can point to no evidence proving that a videotape containing footage of the alleged incident even existed, much less that any federal agents intentionally destroyed such a tape.  Plaintiff cannot demonstrate the type of intentional conduct that a *Bivens* cause of action is intended to address, and summary judgment in favor of the Federal Defendants must be granted.[8]

## IV.    CONCLUSION

For the reasons set forth above, Federal Defendants respectfully request that this Honorable Court grant the motion for summary judgment on all counts.

---

[7]  Plaintiff's recollection that Ed Bacco told her that, "there was a video tape that showed Mr. Burdette was the aggressor," *see* FD Exh. 16 at p. 4, does not establish otherwise.  Bacco's statement, as recollected by Plaintiff, is consistent with Estevez's deposition testimony, and does not provide evidence that there was videotape footage showing the alleged assault taking place.  Moreover, Plaintiff also stated that a Department of Homeland Security investigator told her that he had seen the video and that he could not make out an assault on the video.  FD Exh. 7 (Brown Depo at 130).  Thus, there is no genuine issue that whatever video existed did not show footage of the actual "assault."

[8]  Plaintiff also cannot establish that her constitutional right to access to the courts was violated because she has no underlying claim to support her *Bivens* action.  See Federal Defendants' Partial Motion to Dismiss.

Dated: February 2, 2009                    Respectfully submitted,


                                           PAUL MURPHY
                                           ACTING UNITED STATES ATTORNEY


                                           /s/ Jason T. Cohen
                                           JASON T. COHEN
                                           Assistant United States Attorney
                                           United States Attorney's Office
                                           United States Courthouse & Federal Building
                                           5500 Veteran's Drive, Suite 260
                                           St. Thomas, Virgin Islands 00802-6424
                                           Jason.Cohen@usdoj.gov
                                           Voice: (340) 774-5757
                                           Fax:    (340) 776-3474

OF COUNSEL:
Kevin Houlihan
Transportation Security Administration
Office of Chief Counsel
601 South 12th St.
Arlington, VA  22202
(571) 227-3097
(571) 227-1380 (fax)

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this 2nd day of February, 2009, I electronically filed the foregoing Brief in Support of Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the Plaintiff's counsel, Alan R. Feuerstein, at fsllp@aol.com, and mailed a copy to Plaintiff's counsel via USPS at the following addresses:

> Alan R. Feuerstein, Esq.
> Feuerstein & Smith, LLP
> Office and Post Office Box 17
> St. Louis Place
> Buffalo, New York 14202-1502

and

> Alan R. Feuerstein, Esq.
> Feuerstein & Smith, LLP
> Post Office Box 502008
> St. Thomas, VI  00805-2008

> <u>/s/ Jason T. Cohen</u>
> JASON T. COHEN